Wells Fargo Home Mtge. v Hiddekel Church of God (2004 NY Slip Op 50054(U))

[*1]

Wells Fargo Home Mtge. v Hiddekel Church of God

2004 NY Slip Op 50054(U)

Decided on February 10, 2004

Supreme Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 10, 2004

Supreme Court, Kings County
 Wells Fargo Home Mortgage, Inc. F/k/a Norwest Mortgage, Inc., Plaintiff,
against
Hiddekel Church of God, Inc., et ano., Defendants.
Index No. 11911/02

ABRAHAM G. GERGES, J.
The following papers numbered 1 to 3 read on this motion:
 Papers Numbered
Notice of Motion/Order to Show Cause/
Petition/Cross Motion and
Affidavits (Affirmations) Annexed 1-3 
Opposing Affidavits (Affirmations) 
Reply Affidavits (Affirmations) 
 Affidavit (Affirmation) 
Other Papers 
Upon the foregoing papers, defendant Judy Peeples moves, by order to show cause, for an order (a) staying any further proceedings in the instant foreclosure action pending a determination of the defendant's equitable or legal interests in the subject property, and (b) enjoining co-defendant Hiddekel Church of God (Hiddekel) from disposing of, encumbering or improving the subject property. Plaintiff Wells Fargo Home Mortgage, Inc. f/k/a Norwest Mortgage, Inc. (Wells Fargo) opposes the instant motion. Pursuant to the order to show cause, the court issued a temporary restraining order, dated May 22, 2003, which stayed the transfer of the deed to the property pending the hearing of the instant motion. A hearing was held by the court on July 9, 2003, and continued on August 18, 2003, to determine whether an agency relationship existed between Hiddekel and Wells Fargo which would impact upon defendant's rights and remedies in regard to the instant foreclosure action.
[*2]
In late 1995, Peeples (defendant) decided to purchase a home for herself and her children. She found a home located at 263 Sterling Street in Brooklyn, signed a contract of sale on the property and made a downpayment of $6,500.00 toward the purchase of the premises. Due to credit problems, however, defendant was unable to obtain a mortgage. Soon thereafter, she leaned that Hiddekel operated a program to help first time home owners obtain mortgages.
Under Hiddekel's mortgage program, Hiddekel was to obtain mortgages insured under the federal 203(k) program [FN1], lease the properties to prospective buyers with an option to buy, and transfer the mortgages to the prospective buyers after they completed financial planning classes. Prior to the transfer of such mortgages, the prospective buyers would occupy the properties as lessees and make rent payments which were to be used toward the mortgage payments due under the mortgages between Hiddekel and the mortgagee.
[*3]
Defendant met with Reverend Theresa Springer, a representative of Hiddekel, and joined Hiddekel's 203 (k) mortgage program. Defendant and Reverend Springer executed the following Agreement in regard to defendant's participation in the program. The Agreement stated as follows:
Whereas [Hiddekel], is engaged in a Federal housing program under Section 203k,
And whereas this program is targeted to low-income persons who are in need of financial and budget counselling [sic],
And whereas one of the requirements for qualifying under this program for housing is exposure to financial and budget counseling for a minimum of six months but no more than eighteen months,
Be it resolved that each applicant for participation in the program agrees as follows:
That each participant in program pay a one-time registration fee of $300.
That this fee, payable at the start of the program, is non-refundable.
That each participant participates in a twelve-month program of counselling [sic].
That this counselling [sic] consists of financial management, budget and investment classes.
That all properties acquired through the program are considered the property of [Hiddekel].
That participants assume ownership only when [Hiddekel] transfers the mortgage.
That initially all participants in housing are the tenants of [Hiddekel].
That all properties are leased to tenants by [Hiddekel] with an option to buy.
That participants as tenants pay 1 months rent and 1 months security before moving in.
That all participants are entitled to seek out properties of interest for [Hiddekel's] action.
That all participants must be participants in the program before seeking properties of interest.
Pursuant to the program, Hiddekel entered into a mortgage agreement with Amerifirst Mortgage Company (Amerifirst), to secure a mortgage note in the amount of $155,050, which sum was to be utilized to purchase the subject property. Defendant allegedly provided Hiddekel with $5,000 as a down payment toward the purchase of the property and was also allegedly credited for the down payment in the amount of $6,500, which she had made in relation to the previous contract of sale for which she was unable to obtain financing. On or about May 11, 1996, the closing on the sale of the property took place, and thereafter defendant moved into the property. Defendant allegedly delivered to Reverend Springer her monthly rental payments, which were to be used to pay off part of the mortgage debt.
Sometime in mid to late 1997, Reverend Springer allegedly informed defendant that the "program was in trouble" and indicated that the program participants should place all future monthly payments in escrow. Defendant was also allegedly informed that she should cease making rental/mortgage payments to Hiddekel. Defendant began to receive notices from lawyers in regard to the property. Notwithstanding such notices, Hiddekel allegedly refused to give her any further information concerning the property or the status of the property. Defendant contacted a lawyer and allegedly both she and her lawyer contacted Hiddekel on numerous occasions and were told that Hiddekel was taking care of the matter. Defendant also demanded that Hidekkel turn the deed over to her, but Hiddekel refused to do so.
The mortgage was assigned to Wells Fargo in or about January of 1997. Plaintiff commenced this action in 2001 and subsequently obtained a judgment of foreclosure and sale in regard to the subject property which was entered on or about October 24, 2002. The foreclosure auction was scheduled to be held on May 26, 2003. Prior to the auction date, defendant brought her instant motion by order to show cause. Since the court's temporary restraining order, issued on May [*4]22, 2003, merely stayed the transfer of the deed to the property, and not the foreclosure sale itself, the property was sold to a third party at the foreclosure sale.
In the instant motion, defendant seeks a stay of the underlying foreclosure proceedings pending a determination of defendant's legal and equitable interest in the subject property.[FN2] The court, however, finds that such a determination is largely irrelevant to defendant's potential equitable remedies in regard to the instant foreclosure action, given defendant's undisputed status as tenant at the subject property. Defendant has admittedly received notice of all foreclosure proceedings in the instant action, including notice of the foreclosure sale, and is listed in the action's caption as a defendant. It is well settled that a tenant has an equitable right to redeem his or her landlord's mortgage (see 6820 Ridge Realty, LLC v Goldman, 263 AD2d 22, 28; Goldstein v Soledad Place Corp., 157 Misc.2d 801, 802; The Bowery Savings Bank v Harbert Offset Corp., 147 Misc.2d 633, 634, affd 174 AD2d 645). Even if the court were to find that defendant should be considered the equitable owner, due to her six months of rent payments which were indisputably to be credited toward the mortgage, she would still be limited, as the equitable owner of the property, to the right of redemption, which could be exercised by defendant at any time up until the actual foreclosure sale (see The Bowery Savings Bank, 147 Misc.2d at 634 ["The owner of the equity of redemption or any person with an interest in the property has a right to redeem property prior to the actual sale under a judgment of foreclosure"]). Here, although defendant made an initial down payment and approximately six months of payments toward the mortgage, totaling close to $20,000, defendant ceased making payments after that initial $20,000 and concededly has not made any additional payments for almost six years, although she has continued to reside at the premises. A judgment of foreclosure was entered in regard to the subject premises on or about October 24, 2002. Accordingly, defendant was entitled, as a tenant, to exercise the equity of redemption at any time prior to the sale of the property at a foreclosure auction. To the extent, however, that tenant seeks an order from this court granting equitable relief by entitling her, by dint of her putative "equitable ownership" of the property, to remain in possession of the property and/or to gain title without complying with established redemption procedures, this court is not aware of any authority which sanctions such a novel expansion of the equitable right of redemption, and thereby declines to fashion any remedy which would allow defendant to continue to possess the property and to obtain title to the property without resort to the proper exercise of her redemption rights. The court finds, therefore, that it need not reach a determination as to defendant's ownership status, given that either as a tenant or as an equitable owner, defendant's remedy in regard to the instant foreclosure proceeding is limited to the right of redemption. Accordingly, the court is constrained to deny defendant's motion to stay any further foreclosure proceedings pending a determination as to defendant's equitable or legal ownership status concerning the subject property.
[*5]
Moreover, defendant is not entitled to a stay of the underlying foreclosure proceeding, or a setting aside of the foreclosure sale, as she has not exercised her right of redemption pursuant to the applicable statutory procedure. "[T]he owner of the equity of redemption or any person with an interest in the mortgaged premises has a right to redeem the property at any time prior to the actual sale under a judgment of foreclosure" (First Federal Savings & Loan Assn. of Port Washington v Smith, 83 AD2d 601, 602; see also NYCTL 1996-1 Trust v LFJ Realty Corp., 307 AD2d 957, 958). RPAPL §1341 sets forth the requirements a defendant seeking to redeem property subject to a foreclosure sale must fulfill in order to stay the sale and to exercise his or her right of redemption. RPAPL §1341 states:

Where an action is brought to foreclose a mortgage upon real property upon which any part of the principal or interest is due and another portion of either is to become due, and the defendant pays into court the amount due for principal and interest and the costs of the action, together with the expenses of the proceedings to sell, if any, the court shall:
1. Dismiss the complaint without costs against plaintiff, if the payment is made before judgment directing sale; or
2. Stay all proceedings upon judgment, if the payment is made after judgment directing sale and before sale; but, upon a subsequent default in the payment of principal or interest, the court may make an order directing the enforcement of the judgment for the purpose of collecting the sum then due"
(see also 78 NY Jur 2d, Mortgages and Deeds of Trust § 412 ["Upon a redemption, whether before or pending foreclosure, the mortgagee is ordinarily entitled to receive the whole unpaid principal of the debt secured by the mortgage, with interest, and the costs of the action"]).
Where a defendant "fail[s] to make a payment into court and to make a motion to stay the sale of the property as required by RPAPL § 1341, [the defendant's] right to redemption expire[s]"(NYCTL 1996-1 Trust, 307 AD2d at 958; see also EMC Mortgage Corp. v Bobb, 296 AD2d 476 ["Ordinarily, a stay of proceedings in foreclosure to preserve the mortgagor's right to redeem must occur before the foreclosure sale"]; Green Point Savings Bank v Oppenheim, 237 AD2d 409 [finding that foreclosure sale "properly went ahead and was not rendered null and void" where defendant tendered payment at the "eleventh hour, and failed to move to stay the sale (pursuant to RPAPL § 1341 [2]"]). "RPAPL § 1341 is mandatory in nature and does not allow for a discretionary interpretation or application" (Green Point Savings Bank, 237 AD2d at 410). Moreover, "[i]n the absence of fraud, collusion, mistake or misconduct, a court is without discretion to set aside a sale of foreclosure unless the requirements of RPAPL § 1341 are met" (NYCTL 1996-1 Trust, 307 AD2d at 959 [holding that the court was precluded from invalidating a sale of foreclosure where the defendant failed to follow the redemption procedures set forth in RPAPL § 1341]).
Here, defendant failed to follow the redemption procedures mandated by RPAPL § 1341, and therefore is not entitled to an order staying the underlying foreclosure action or setting aside the foreclosure sale. It is undisputed that defendant did not make a payment of any sum into court, but merely moved the court, by an emergency order to show cause filed approximately a week before the scheduled date of the foreclosure auction, to stay any further proceedings in the foreclosure [*6]action, including said foreclosure sale, as well as the transfer of the deed, pending a determination as to whether defendant was the "equitable owner" of the subject property. As previously discussed, defendant was a necessary party to the foreclosure action, was notified of the foreclosure proceedings and sale, and, as a tenant and party with an interest in the property, also possessed an equitable right of redemption which was not dependent upon a determination as to her putative equitable ownership rights. Accordingly, defendant was required to comply with the redemption requirements mandated by RPAPL § 1341 in order to redeem the property prior to the foreclosure sale. To the extent that defendant now urges the court, in effect, to vest her with title to the property, stay any further foreclosure proceedings and allow her to avoid foreclosure of the property without requiring her compliance with established redemption procedures, the court is not aware of any authority, nor has defendant cited to any, which allows the court to bypass the redemption procedures outlined in RPAPL §1341 and to vest title to the subject property in defendant on the aforementioned terms. As the foreclosure sale has been completed, and defendant did not exercise her right of redemption prior to the sale, such right is now deemed extinguished (NYCTL 1996-1 Trust, 307 AD2d at 958). Accordingly, although defendant's situation may be unfortunate, the court is, nonetheless, constrained to deny her motion to stay all foreclosure proceedings in the instant action.
To the extent that defendant moves to set aside the subject foreclosure sale on the ground of fraud, this portion of defendant's motion must also fail. It is well settled that "[t]hough the right of redemption has been lost, the court may still vacate a foreclosure sale where there has been fraud, collusion, mistake, misconduct, surprise or an inadequate price on the sale" (The Bowery Savings Bank, 147 Misc.2d at 635; see also NYCTL 1996-1 Trust, 307 AD2d at 959; Long Island Savings Bank of Centereach v Valiquette, 183 AD2d 877). Defendant alleges that, as a tenant with an option to buy the subject property, she made payments to Hiddekel, over a period of approximately six months, constituting both a down payment which was to be credited toward her purchase of the property and mortgage payments on the property which were to be sent to the mortgagee by Hiddekel. She further asserts that she ceased making payments only when Hiddekel informed her that she should not make any further payments to Hiddekel but instead should begin to put such payments into the escrow account because the property was going into foreclosure. Despite its representations to defendant that the rent payments would be sent to the mortgagee and applied to the mortgage, Hiddekel allegedly failed to make any of the required mortgage payments to the mortgagee and thereby caused the subject mortgage to go into foreclosure. Defendant argues that the fraudulent misconduct of Hiddekel warrants the imposition, by this court, of a stay of any further proceedings in the foreclosure action. Given that the foreclosure sale has already occurred, the court construes defendant's motion also as one for the setting aside of the sale on the same basis.
Although defendant has presented some evidence to the court which tends to support her allegations in regard to Hiddekel's alleged misconduct and fraudulent acts, defendant has presented no evidence that Amerifirst, as the original mortgagee, Wells Fargo, as assignee of the mortgage, or HUD [FN3], the insurer of the subject mortgage, engaged in any such fraud or misconduct.
[*7]
Pursuant to the framed issue hearing held in the instant matter on the issue of whether a sufficient agency relationship existed between Amerifirst and Hiddekel to allow Hiddekel's alleged wrongdoing to be imputed to Amerifirst, the court finds that there is not sufficient evidence as to the scope of the agency relationship, if any, between Amerifirst and Hiddekel, or evidence that Hiddekel's allegedly fraudulent acts were within the scope of such agency, to support the setting aside of the foreclosure sale, as an equitable remedy, on the basis of such alleged fraud or misconduct. "[A] principal, even if innocent, is liable for acts of fraud that are within the scope of an agent's actual or apparent authority" (Chubb & Son Inc. v Consoli, 283 AD2d 297, 298; see also 2A NY Jur 2d, Agency and Independent Contractors § 290 ["a principal is liable for the fraudulent acts of his or her agent committed within the scope of the agent's authority . . .[and] is liable . . . [for] pecuniary loss to a third party when the agent acts within the scope of his or her apparent authority."]. "Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction" (Standard Funding Corp. v Lewitt, 89 NY2d 546, 551 [internal quotation marks and citation omitted]). "In such circumstances, the third party's reasonable reliance upon the appearance of authority binds the principal" (id.). Where an agent's misconduct falls outside of the scope of activities authorized by the agency agreement between the agent and his or her principal, however, the principal will not be liable for such misconduct (see id.). Moreover, pursuant to the "adverse agent" rule, a principal is relieved of liability for an agent's acts when the agent "totally abandons the principal's interests and acts entirely for his or another's purposes" (Chubb & Son, Inc., 283 AD2d at 298).
The court notes that, on the record before it, the evidence is insufficient to either demonstrate that an agency relationship existed between Hiddekel and Amerifirst, or establish the scope or extent of such an alleged agency. No written agency agreement of any sort has been produced. Nor was any testimony offered by a representative of Amerifirst in regard to the alleged agency relationship between Hiddekel and Amerifirst. Reverend Springer, a representative of Hiddekel, testified that representatives from Amerifirst approached Hiddekel in regard to instituting the mortgage program. Reverend Springer testified that "the steps [for the program] was [sic] that we interview the people, prospective tenants that would purchase the property eventually. And we would get the property they would choose, the church purchases the property in the church name, leases the property to tenant with option to purchase." Reverend Springer further testified that the tenants/prospective buyers were required to attend financial counseling classes and to fulfill other criteria, which was allegedly established by Amerifirst, in order to be considered by Amerifirst as a mortgagor to whom Hiddekel, as the original mortgagor, would subsequently transfer the mortgage. Amerifirst also allegedly made the final determination as to whether a mortgage held by Hiddekel would be transferred to a particular tenant.
Defendant testified, in somewhat conclusory terms, that it was "pretty much" her understanding that Amerifirst "was working with" Hiddekel to administer the mortgage funds. [*8]Defendant did not testify, however, as to any specific words or conduct on the part of Amerifirst which directly communicated to defendant the existence of an agency relationship between Amerifirst and Hiddekel. Defendant claims that she had seen advertisements in regard to 203 (k) mortgages offered by Amerifirst, but it was not clear from her testimony to what extent, if any, such advertisements evidenced, if at all, an agency relationship between Amerifirst and Hiddekel, and no such advertisements have been submitted to the court. Moreover, the written agreement between defendant and Hiddekel in regard to defendant's participation in the mortgage program operated by Hiddekel does not mention Amerifirst, and the name Amerifirst only appears in the mortgage documents as the named mortgagee.
The court finds that the record before it is insufficient to establish the scope and nature of the alleged agency relationship between Hiddekel and Amerifirst, or that such an agency relationship existed, and is therefore insufficient to render Amerifirst, as the original mortgagee, liable, under an agency theory, for Hiddekel's alleged misfeasance. Given the dearth of documentary evidence, and the fact that the only testimony presented at the framed issue hearing as to the actual nature of the alleged agency relationship between Hiddekel and Amerifirst was that of Reverend Springer, a representative of the alleged actively fraudulent party, Hiddekel, the court does not find that any credible evidence exists supporting the imputation of Hiddekel's alleged fraud to Amerifirst. Moreover, even if there were evidence that Hiddekel acted as Amerifirst's agent in establishing rental agreements with tenants, and collected rents toward payments on its mortgages with Amerifirst as an agent of Amerifirst, there is no evidence before this court that Hiddekel's alleged fraudulent activity in failing to provide Amerifirst with such payments, and its alleged wrongful appropriation of same, directly inured to Amerifirst's benefit. Accordingly, the court finds that there is insufficient evidence that any alleged fraud committed by Hiddekel can be imputed to Amerifirst under an agency theory. As a result, the court also finds that there is insufficient evidence of any fraud or misconduct on the part of Amerifirst as mortgagee, or its assignee, Wells Fargo, which would warrant a setting aside of the foreclosure sale in this action.[FN4]
In summary, defendant's motion for an order (a) staying any further proceedings in the instant foreclosure action pending a determination of the defendant's equitable or legal interests and (b) enjoining co-defendant Hiddekel from disposing of, encumbering or improving the subject real property is denied in its entirety. This court's temporary restraining order, dated May 22, 2003, which stayed the transfer of the deed pending the hearing of the instant motion, is hereby vacated.
The foregoing constitutes the decision and order of the court.
E N T E R,
J. S. C.
Decision Date: February 10, 2004
Footnotes

Footnote 1: 203 (k) mortgage loans refer to loans which are insured pursuant to Section 203 (k) of the National Housing Act, 12 U.S.C. § 1709 (k), and the regulations promulgated thereunder (see 24 C.F.R. § 203.40, et seq.). Such loans are administered by the federal government through the Department of Housing and Urban Development ("HUD"). A recent federal case, Banks v Consumer Home Mortgage, Inc., (2003 WL 21251584, *2, n 4), citing to HUD's website, provides the following description of the 203(k) federal program:
When a homebuyer wants to purchase a house in need of repair or modernization, the homebuyer usually has to obtain financing first to purchase the dwelling; additional financing to do the rehabilitation construction; and a permanent mortgage when the work is completed to pay off the interim loans with a permanent mortgage. Often the interim financing (the acquisition and construction loans) involves relatively high interest rates and short amortization periods. The Section 203(k) program was designed to address this situation. The borrower can get just one mortgage loan, at a long-term fixed (or adjustable) rate, to finance both the acquisition and the rehabilitation of the property. To provide funds for the rehabilitation, the mortgage amount is based on the projected value of the property with the work completed, taking into account the cost of the work. To minimize the risk to the mortgage lender, the mortgage loan (the maximum allowable amount) is eligible for endorsement by HUD as soon as the mortgage proceeds are disbursed and a rehabilitation escrow account established. At this point the lender has a fully-insured mortgage loan.
The 203 (k) program has also been described as "[HUD's] primary program for the acquisition or refinancing and rehabilitation of one to four family properties" (Grant v West, 2001 WL 1597804 (E.D.N.Y. 2001, *1, n 5) [internal quotation marks and citation omitted]. "Pursuant to the National Housing Act . . . HUD is authorized to insure mortgages executed to finance the purchase of residential properties. Applicants who wish to participate in the single-family mortgage insurance program must apply to a HUD-approved mortgage lender, who then applies to HUD" (DeRoo v United States, 12 Cl. Ct. 356, 359).

Footnote 2: The court notes that defendant also moves for an order enjoining Hiddekel from disposing of, encumbering or improving the subject real property. However, as the property was sold at a foreclosure sale, Hiddekel's right of redemption, and any other rights in the property, were extinguished upon the sale, and it is not necessary for this court to further enjoin Hiddekel from disposing of, encumbering or improving the subject real property. Accordingly, the court deems plaintiff's motion in this regard as moot.

Footnote 3: The court notes that any fraudulent activity on the part of Hiddekel cannot be imputed to HUD as the insurer of the mortgage and the administrator of the 203(k) program. There is no evidence before the court that an agency relationship existed between HUD and Hiddekel. Moreover, even if such an agency relationship existed, "it is well settled that anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority" (DeRoo, 12 Cl. Ct. at 360). "Accordingly, the Government is not bound by the acts of its agents which exceed the scope of those agents' actual authority" (id.).

Footnote 4: Moreover, the court notes that even if it were to set aside the subject foreclosure sale on equitable grounds, the scope of such remedy would be limited to the setting aside of the sale followed by a scheduled re-sale of the property, would merely afford defendant an opportunity to either redeem the property prior to the sale or to participate in the sale, and would not vest her with any other or additional rights in the subject property.